UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-44-B-W |
| | ) | |
| ROBERT J. VENTURA | ) | |

**COMPETENCY ORDER**

Following a hearing held in accordance with 18 U.S.C. § 4247(d), the Court concludes that Robert J. Ventura is presently suffering from a mental disease or defect rendering him incompetent to the extent that he is unable to assist properly in his own defense.

**I.    STATEMENT OF FACTS**

    **A.    The Competency Hearing**

On March 12, 2009, the Court held a hearing in compliance with 18 U.S.C. § 4247(d) to determine the Defendant's mental competency to assist properly in his defense pursuant to 18 U.S.C. § 4241(a). Once competency is raised, the Government bears the burden to establish that the Defendant is competent "by a preponderance of the evidence." 18 U.S.C. § 4241(d); *United States v. Thomas*, 519 F. Supp. 2d 135, 137-39 (D. Me. 2007); *United States v. Patel*, 524 F. Supp. 2d 107, 114 (D. Mass. 2007). The parties agree that Mr. Ventura understands the "nature and consequences of the proceedings against him" and that the sole disputed issue is whether he is able to "assist properly in his defense." 18 U.S.C. § 4241(a). The Government presented the report and testimony of clinical psychologist Ron Nieberding, Ph.D., who opined that the Defendant is competent. The defense presented the Defendant's testimony and the reports and testimony of clinical psychologists Robert Gallon, Ph.D., and Jonathan Freedman, Ph.D.

### B. The Pending Charges and the Issue of Competency

Mr. Ventura stands charged with two federal firearm crimes: (1) possession of a short-barrel shotgun with an obliterated serial number; and, (2) possession of the same firearm by a felon. *Indictment* (Docket # 1). The charges stem from allegations that Mr. Ventura was involved in a reckless series of events on November 20, 2005 during which the Government claims he possessed a short-barrel shotgun. The Government says Mr. Ventura stole a vehicle, became involved in a high-speed chase, crashed the vehicle, and fled into the woods on foot; during the ensuing chase, a K-9 dog located the shotgun in the woods, but not Mr. Ventura. *Def.'s Ex.* 2, *Dr. Gallon Report* at 9. Mr. Ventura's involvement in the chase and possession of the shotgun came to light later during a state investigation of allegations of domestic abuse and sexual assault in the summer of 2006. *Id.*

A federal grand jury indicted Mr. Ventura on July 19, 2007. *Indictment*. Mr. Ventura was arraigned on August 1, 2007 and Attorney Stephen Smith was appointed to represent him. A question of Mr. Ventura's competency arose and on February 13, 2008, the Government moved for a psychiatric examination; the Court granted the motion on February 15, 2008. *Gov't's Mot. for Competency Evaluation* (Docket # 43); *Order* (Docket # 45). Dr. Ron Nieberding evaluated Mr. Ventura at the Metropolitan Correctional Center in Chicago, Illinois, and on May 30, 2008, he prepared a forensic report, which he filed with the Court in accordance with 18 U.S.C. § 4241(b). Dr. Nieberding acknowledged that Mr. Ventura was "experiencing symptoms associated with [alcohol dependence, depressive disorder NOS, and antisocial personality disorder]," but concluded that there was no evidence to indicate that "these factors were significantly impacting his factual and rational understanding of the current legal circumstances, or his ability to assist counsel." *Gov't Ex.* 1, *Dr. Nieberding Report* at 9.

Dr. Nieberding's conclusion conflicted with Dr. Jonathan Freedman's earlier determination, made in connection with the pending state charges, that Mr. Ventura had "chronic difficulties trusting attorneys," which stemmed from cognitive disorganization caused by "chronic mental illness." *Def.'s Ex.* 1, *Dr. Freedman Report dated Jan. 31, 2008* at 5 (*Freedman Jan. Report*). To seek to clarify these discrepancies, Mr. Ventura moved for and was granted a second psychological examination. *Def.'s Mot. for Psychological or Psychiatric Funds to Re-Evaluate Def.* (Docket # 52); *Order* (Docket # 56). Dr. Freedman, whose previous determination was based on an examination of Mr. Ventura on January 3, 2008, re-examined Mr. Ventura on August 4 and 18, 2008 pursuant to the Court's Order. *Def.'s Ex.* 3, *Dr. Freedman Report dated Nov. 6, 2008* (*Freedman Nov. Report*). In his November report, Dr. Freedman concluded that Mr. Ventura has an observable "residual paranoid delusional system," and his difficulties with his attorney are "based on deficits in rational thinking and a tendency to engage in paranoid distortions of reality." *Id.* at 9. In the interim, Mr. Ventura met with Dr. Robert Gallon on September 17, 2008 in relation to the state charges, but he refused to undergo an examination. *Def.'s Ex.* 2, *Dr. Gallon Report*.

    **C.**    **The Evidence**

        **1.**    **Mr. Ventura's Testimony**

The hearing consisted of the experts trying to explain Mr. Ventura and Mr. Ventura trying to explain himself. Mr. Ventura grew up in Connecticut and had a chaotic upbringing. He has a complicated relationship with his mother, who he contends tried to poison him; he has had a number of run-ins with the law, some resulting in convictions; he has experimented with drugs; and, on at least one occasion, he was involuntarily admitted for psychiatric reasons to a Connecticut hospital. In 2004, he removed himself from Connecticut, and came to northern

Maine in an effort to clear his head.  This self-exile worked for a while, but as he explained, his mind deteriorated and he went spiraling downward, and this led to his involvement in the high-speed chase in November 2005.  *Mar. 12, 2009 Tr.* at 50, 57, 123-24 (Docket # 86).

During his testimony, Mr. Ventura focused obsessively on details.  He spoke at length about a medical record from March of 2004 he believes was missing from the stack of hospital records initially received from St. Mary's Hospital in Connecticut.  Having subsequently obtained this record on his own, he said it proves that he was correct in believing that people were following him in Connecticut and that he was being poisoned.  He emphasized that the record of the visit to St. Mary's Hospital in 2004 is the most important thing for the defense of the pending federal criminal charges.  *Id.* at 52-57, 70-71.

Mr. Ventura was also most anxious to tell a jury why he had taken the truck, possessed the shotgun, and headed south.  He explained that he was afraid he was going to be killed.  He identified the potential killer or killers as either a part of a gang in Connecticut that he knew about because he had been incarcerated there, a club affiliated with the Hell's Angels, or a person his parents had hired to finish the poisoning job.  *Id.* at 59-60.  He also said that he thought then that his cell phone was being bugged and his truck was being tracked by a GPS system.  *Id.* at 81, 83, 125-26.  He knows now that he was not being bugged or tracked, *id.* at 125-26, but he stressed that he was willing to take any amount of prison time if he were only allowed to go to trial and show the jury why he had been driven to possess the firearm in 2005. *Id.* at 66-67, 84-89.

Mr. Ventura is emphatic that the jury should learn about his relationship with his mother. He questions whether his mother had taken out life insurance on him and whether the person who was following him around had been using his mother's credit card to purchase gas.  He

wants his attorney to obtain records of his mother's credit card purchases to determine whether this is so. His concern about his mother would be part of his effort to demonstrate to a jury that he had a good reason to believe that someone was out to get him. *Id.* at 89-90.

Mr. Ventura also wants the jury to learn about his former girlfriend. He wants her to be called as a witness to demonstrate that he is not mentally ill. He explained that he asked his girlfriend to buy him a gun and that she said she was willing to do so. He stressed that this testimony would demonstrate that he is not mentally ill, since she would not have been willing to buy him a firearm if he were. *Id.* at 62-64. In addition to his girlfriend, if Boyd and Rose Chase, his neighbors, were called to testify, they could confirm that his girlfriend had agreed to buy him a gun. *Id.* at 78-80.

Mr. Ventura has a contentious relationship with his current attorney. *Id.* at 92. He estimated that he has been represented in the past by as many as thirty to fifty lawyers, and he admitted that with the exception of one female lawyer from Connecticut, he has always had a difficult time with his lawyers. *Id.* at 100-03. When he first met Mr. Smith, he told him that he, Mr. Ventura, was to the right of him, and to the left of him, and to the middle, and he was not sure which way he wanted to go. *Id.* at 65, 69. He complained that Mr. Smith had ignored his repeated requests for investigation into the matters he thinks are essential to an adequate defense. He wants Mr. Smith to find a way to discuss in a direct way how he is going to present to a jury critical evidence, such as his family issues, the 2004 hospital record, and similar matters. *Id.* at 74-82. He stressed that he wants this evidence presented not to convince the jury that what he thought was true was actually true, but rather to establish that he actually did think it was true at the time. *Id.* at 58, 74, 80, 86. He repeated his view that the truth, which neither lies nor changes, does not need a defense. *Id.* at 83, 120, 160, 214.

In response to specific questions about possible defenses to the federal charges, Mr. Ventura explained his understanding of the difference between not guilty and not guilty by reason of insanity. He stated that, because he accepts some responsibility for his actions, the jury should not find him not guilty, which would mean that absolutely nothing was his fault. Instead, the jury should find him not guilty by reason of insanity, because he was mentally incapable of making the right decision. *Id.* at 91-92. He also testified that he does not believe he was insane at the time of the offense, that he knew at the time what he was doing was wrong, and that he felt he had only one choice. *Id.* 81-82. When asked to explain whether his behavior resulted from fear, insanity, or both, Mr. Ventura said that he was so fearful and deprived of sleep that he was driven insane. *Id.* at 85.

### 2. Dr. Freedman's Explanation: Paranoid Delusion

Of the experts who testified, the Court accepts the testimony of Dr. Freedman as the most persuasive. Dr. Freedman twice examined Mr. Ventura extensively, and observed his courtroom testimony on March 12, 2009 before testifying himself. Additionally, although Dr. Freedman (like Dr. Nieberding) diagnosed Mr. Ventura with antisocial personality disorder, he also determined that he suffered from delusional disorder, which he believes impacts his capacity to cooperate with his attorney. *Gov't Ex.* 1, *Dr. Nieberding Report* at 8; *Freedman Nov. Report* at 8. Dr. Freedman opined that Mr. Ventura exhibited symptoms consistent with a delusional disorder combined with paranoia. He explained that people with this type of disorder feel very threatened if their ideas are challenged and will resist and rebel against such challenges. *Tr.* at 170. In Mr. Ventura's case, as in others', this condition also provokes a focus on trivial matters as reflective of general principles, and a tendency to view incidental events as causal. For example, Mr. Ventura once told Dr. Freedman that at some point after he became afraid of his

mother, a man was removing some tree stumps near his mother's house. Mr. Ventura became convinced that the man was part of his mother's conspiracy against him. Thus, attributing tremendous significance to small unrelated events, Mr. Ventura has become obsessed with such pieces of evidence as the 2004 hospital record and the notion that his mother is trying to poison him. Dr. Freedman characterized these ideas as paranoid delusions, which, from Mr. Ventura's perspective, have become essential to the defense of the federal firearm charges. *Id.* at 170-74.

Dr. Freedman explained that persons with fixed paranoid delusions, in addition to being extremely sensitive when those delusions are challenged, often maintain a sense of grandiosity, a need to be seen as generally competent. *Id.* at 173, 177. In Dr. Freedman's opinion, Mr. Ventura is unable to tell the difference between his competence as a human being and his competence to stand trial. He has thus focused his irritation on his attorney, who in order to prepare a defense and to investigate his competency to stand trial, has been required to challenge Mr. Ventura's view of what is real and relevant. *Id.* at 177. In Dr. Freedman's view, no attorney could effectively alter Mr. Ventura's fixed delusions without incurring his hostility. The sole exception would be a lawyer, such as the female attorney who represented him in Connecticut, who engages in an extremely long-term relationship with Mr. Ventura and slowly gains his trust. *Id.* at 188-91.

Dr. Freedman rejected the contention that Mr. Ventura's difficulty assisting in his defense is a function of a personality conflict he has with his current lawyer, which would be resolved if only a counterpart to the female lawyer in Connecticut could be found and appointed to represent him. Dr. Freedman explained that Mr. Ventura might initially agree with an attorney's advice, but he could well change his mind, and he is unable to judge rationally what would be in his own best interest. To do his or her job, a defense lawyer would be required to confront Mr. Ventura's

idiosyncratic view of reality and, once done, Mr. Ventura would likely become frustrated and mistrustful. The doctor opined that it is more likely than not Mr. Ventura would display behaviors incompatible with his long-term interests. *Id.* at 176-79.

### 3. Defense Counsel's Opinion

Attorney Smith has repeatedly expressed the view that Mr. Ventura has been unable to participate effectively in his own defense.

## II. DISCUSSION

### A. The Legal Standards

The conviction of an incompetent defendant violates due process. *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *United States v. Giron-Reyes*, 234 F.3d 78, 80 (1st Cir. 2000). Upon a motion to determine competency and following a § 4247(d) hearing, a court "shall commit the defendant to the custody of the Attorney General" if it finds by a preponderance of the evidence "that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent . . . to assist properly in his defense."[1] 18 U.S.C. § 4241(d). It is not enough for the defendant to be oriented as to time and place and have some recollection of the events; rather, the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 402 (1960); *United States v. Soldevila-Lopez*, 17 F.3d 480, 489 (1st Cir. 1994). Phrased differently, the test for competence is whether the defendant has the present ability to "communicate effectively with defense counsel." *Cooper v. Oklahoma*, 517 U.S. 348, 368 (1996); *Pike v. Guarino*, 492 F.3d 61, 72 (1st Cir. 2007). On the other hand, the First Circuit has distinguished between a defendant who is unwilling to cooperate in his defense and a defendant who is unable to do so.

---

[1] With respect to the second prong of the competency inquiry, the parties agree that Mr. Ventura understands the "nature and consequences of the proceedings against him." 18 U.S.C. § 4241(d). Having had the opportunity to assess this aspect of Mr. Ventura's competence, the Court agrees.

*United States v. Vachon*, 869 F.2d 653, 654-56 (1st Cir. 1989). In evaluating competency, the Court should take into account the opinion of defense counsel. *Drope v. Missouri*, 420 U.S. 162, 177 n.13 (1975) (stating that "an expressed doubt . . . by one with the closest contact with the defendant is unquestionably a factor which should be considered" (internal punctuation and citation omitted)).

  **B.**  **Competence**

The Court cannot conclude that Mr. Ventura is presently able to properly assist in his defense. At its most basic level, Mr. Ventura has two potential defenses—not guilty or not guilty by reason of insanity. In taking the stand and testifying on March 12, 2009, Mr. Ventura admitted that he was guilty of possessing the firearm, but only wanted to explain why he was driven to possess it. Most fundamentally, it is difficult to conclude that a defendant is able to assist properly in his defense when he voluntarily takes the stand and admits that he committed the charged crimes.

The second possible defense is not guilty by reason of insanity.[2] Here, the standard is set forth in 18 U.S.C. § 17(a): the defendant must prove by clear and convincing evidence that "'as a result of a severe mental disease or defect, [he] was unable to appreciate the nature and quality or the wrongfulness of his acts.'" *United States v. Ramirez*, 495 F. Supp. 2d 92, 120 (D. Me. 2007) (quoting 18 U.S.C. § 17(a)). Here, Mr. Ventura testified that he knew what he was doing was wrong, but that he thought it was his only choice, because he had a legitimate reason to be afraid. Whether this testimony would be sufficient to sustain an insanity defense remains to be seen, but to admit he knew his actions were wrong does not appear to assist his defense that he was unable to appreciate the nature and quality or wrongfulness of his acts.

---

[2] Mr. Ventura filed a notice of an insanity defense pursuant to Rule 12.2(a) the day before the March 12, 2009 competency hearing. *Def.'s Notice of an Insanity Defense* (Docket # 76); *see* Fed. R. Crim. P. 12.2(a).

Further, the Court readily concludes that Mr. Ventura's insistence that his lawyer present evidence at trial about such tangential matters as the 2004 Connecticut hospital record, his mother's alleged attempts to poison him, the willingness of his girlfriend to purchase a gun for him, and a myriad of other elusive details confirms Dr. Freedman's diagnosis and opinions. It is not that Mr. Ventura cannot focus on the case. Rather, it is that he remains tenaciously obsessed with marginal or irrelevant matters, cannot be refocused on evidence that would allow a successful defense, and becomes irritable when questioned even by his own lawyer. Mr. Ventura's occasionally emotional and sometimes angry responses to the questions of his own attorney and his benign and friendly reactions to the questioning of the prosecuting attorney confirm that at a most fundamental level, he cannot assist properly in his defense.

Moreover, because Mr. Ventura is unwavering in his conviction that he must fully disclose the truth to the jury, the Court construes his testimony and behavior towards defense counsel not as evidence of what he is willing and unwilling to do, but instead as evidence of what he is able and unable to do. *See Vachon*, 869 F.2d at 654-56. Contrary to the Government's view that Mr. Ventura is simply predisposed to choose to disregard his counsel's advice, *Tr.* at 202-04, the Court interprets his compulsion to explain to the jury the minutiae of his paranoid delusions to be an involuntary impairment of his ability to assist counsel.

### C. Treatment

Dr. Freedman offered hope. He opined that Mr. Ventura could well benefit from a regimen of psychotropic medication, and he suggested that Mr. Ventura be examined by a psychiatrist to evaluate his suitability for such a course of therapy. Although not a psychiatrist, Dr. Freedman said he did not think the Klonopin Mr. Ventura is currently taking to relieve anxiety would address his underlying mental health problems. Further, Dr. Freedman thought

that, when combined with appropriate medicine, Mr. Ventura could also benefit from a course of psychotherapy. Although admitted to various mental health institutions in the past, Mr. Ventura has not received this type of intensive mental health treatment since his arrest. He has been held in a county jail, which does not have the range of mental health resources available to the United States Bureau of Prisons. *Tr.* at 174-75.

### III. CONCLUSION

The Court concludes that the Government has failed to sustain its burden of proof to demonstrate that the Defendant is currently competent to stand trial, specifically to assist properly in his defense. Instead, the Court finds by a preponderance of the evidence that "the [D]efendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to . . . assist properly in his defense." 18 U.S.C. § 4241(d). The Court hereby commits the Defendant to the custody of the Attorney General. The Attorney General shall hospitalize the Defendant for treatment in a suitable facility for such reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future, he will attain the capacity to permit the proceedings to go forward and for such additional reasonable period of time until his mental condition is so improved that trial may proceed, if the Court finds that there is a substantial probability that within such additional period of time, he will attain the capacity to permit the proceedings to go forward, or the pending charges against him are disposed of according to law, whichever is earlier.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 9th day of April, 2009